FILED

2007 Jan-12  PM 12:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TANYA MEFFORD,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:05-cv-1701-UWC** |
| | ) | |
| **ORTHO-MCNEIL** | ) | |
| **PHARMACEUTICAL, INC.;** | ) | |
| **JOHNSON & JOHNSON, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this diversity action, Plaintiff Tanya Mefford claims damages for injuries allegedly sustained as a result of her ingestion of Levaquin, a product manufactured by Defendant Ortho-McNeil Pharmaceutical, Inc., a subsidiary of Defendant Johnson & Johnson, Inc. The action is brought under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").   Plaintiff claims that she was inadequately warned of the dangers of the product.[1]

At the close of discovery, the Defendants have moved for summary judgment.

---

[1] Plaintiff has abandoned her claims of breach of express warranties, breach of implied warranty of fitness for particular purpose, and breach of implied warranty of merchantability.  (Compl. ¶¶ 25,35, 40, 46.)

-1-

(Doc. 22).[2]  The Defendants contend that Plaintiff's only evidence on the essential element of causation, the testimony of Dr. Robert Williams, is inadmissible under Federal Rule of Evidence 702 as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578 (1993).

On consideration of all of the evidence and the governing legal principles, the Court concludes that, based on undisputed facts, the Defendants are entitled to judgment as a matter of law.

## THE UNDISPUTED FACTS

Defendant Ortho-McNeil manufactures, distributes, and sells Levaquin ("LVQ"), a fluoroquinolone antibiotic.  This product has been prescribed for and used worldwide by over 100 million and up to 500 million people since it was first placed on the market.

On March 12, 2003, Plaintiff complained to her physician, Dr. Charles Mullins, of burning and pain with urination, increased frequency of urination, and lower abdominal and back pain. Dr. Mullins prescribed LVQ,[3] and Plaintiff proceeded to

---

[2] Also pending are the Defendants' Motion to Strike (Doc. 30), and Plaintiff's Motion to Exclude Defendants' Witness Dr. Michael Corrado, (Doc. 43).  In light of the disposition of the summary judgment motion, these motions are moot.

[3] The LVQ package insert states:

Serious and sometimes fatal events, some due to hypersensitivity, and some due to uncertain etiology, have been reported rarely in patients receiving therapy with

use it.

Prior to March 12, 2003, Dr. Mullins had "probably" not read the LVQ package insert in its entirety, but he had read "portions of it." (Defs.' Evidentiary Submission in Supp. of the Mot. for Summ. J., Doc. 23, Ex. 1, Mullins Dep. at 22.) He had no concerns about the safety of LVQ, as he had prescribed it for patients as far back as 1995-96. (*Id.* at 20.)

On March 14th, Plaintiff experienced nausea, vomiting, and abdominal pain, which she presented to Dr. Mullins. He ordered blood tests, and the lab reports from the March 14th blood samples revealed mycoplasma pneumonia and an elevated creatinine level of 3.0.[4] Four days later, on March 18th, Dr. Mullins prescribed LVQ for five more days.

_____

quinolones, including levofloxacin. These events may be severe and generally occur following the administration of multiple doses. Clinical manifestations may include one or more of the following: fever, rash or severe dermatologic reactions (e.g., toxic epidermal necrolysis, Stevens-Johnson Syndrome); vasculitis; arthralgia; myalgia; serum sickness; allergic pneumonitis; **interstitial nephritis**; acute renal insufficiency or failure; hepatitis; jaundice; acute hepatic necrosis or failure; anemia, including hemolytic and aplastic; thrombocytopenia, including thrombotic thrombocytopenic purpura; leukopenia; agranulocytosis; pancytopenia; and/or other hematologic abnormalities. The drug should be discontinued immediately at the first appearance of a skin rash or any other sign of hypersensitivity and supportive measures instituted. (See **PRECAUTIONS: Information for Patients and ADVERSE REACTIONS**.) (first emphasis added; second emphasis in original).

(Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., Doc. 27, Ex. 7, Barbara G. Matthews Dep. at Ex. 13.)

[4] Creatinine is a metabolic product that is generally produced at a constant rate from the conversion of creatinine in muscle to creatinine in the liver. It is largely excreted by the kidneys and commonly used as a marker of kidney function. A normal creatinine level is around 1.

When Plaintiff saw Dr. Mullins on April 1st complaining of cough, sore throat, and overall fatigue, he admitted her to Huntsville Hospital.

During Plaintiff's stay at Huntsville Hospital, she was treated by Dr. Robert Williams, a board certified nephrologist. Dr. Williams ordered urine studies, specifically to screen for eosinophils, due to Plaintiff's exposure to a fluoroquinolone.[5]   The urinalysis was benign.  Dr. Williams subsequently ordered a kidney biopsy, and a pathology report completed by Dr. Robert G. Horn revealed acute interstitial nephritis severe, probably allergic or toxic etiology, without any primary glomerulopathy identified.  In Dr. Williams' view, the biopsy report was consistent with, but not diagnostic of, drug-induced interstitial nephritis.

Dr. Williams began steroid therapy to treat Plaintiff's interstitial nephritis.  By May 7th, Plaintiff's creatinine level was 1.3, essentially normal and her interstitial nephritis was resolved. However, between May 21st and June 2nd, Plaintiff began complaining of swelling in her face, swelling in her upper extremities, and pain in her eyes.  Plaintiff was admitted to Huntsville Hospital and eventually diagnosed by Dr. Randall Read with tubulointerstitial nephritis and uveitis[6] syndrome ("TINU"). Uveitis has resulted in significant damage to Plaintiff's eyesight, rendering her legally

---

[5]The presence of eosinophils in the urine is highly characteristic of an allergic reaction.

[6] Uveitis is a condition where the uvea, a layer of tissue in the eye between the sclera and retina, becomes inflamed.

blind.

Acute interstitial nephritis is a kidney disease characterized by inflammation of the interstitium, which is the matrix that holds the tubules and glomeruli of the kidney together.  Interstitial nephritis has many causes  -  including antibiotics such as penicillin drugs, cephalosporins, fluoroquinolones, and nonsteroidal anti-inflammatory drugs.[7]  In 30 to 40 percent of interstitial nephritis cases, an antigen cannot be associated.  (Doc. 23, Ex. 2, Williams Dep. at 7.)

Plaintiff may have suffered from interstitial nephritis before she began taking the fluoroquinolone  LVQ,  since there is no record of her creatinine level prior to that time. Her initial complaints of vomiting and nausea, prior to being prescribed LVQ, may well  be associated with interstitial nephritis.  Additionally, at the time of her diagnosis, Plaintiff was also taking Protonix, Amoxicillin, and Skelaxin, which have also been associated with interstitial nephritis.

---

[7]According to Dr. Williams,

> there are many, many, many causes [of acute interstitial nephritis]. Probably the most common cause is untoward drug reactions, any antigen – for instance, it's been described after snake bites, it's been described after spider bites, it's been described after bee stings, it's been described after ingestion of a number of agents. Many of these are very rare and uncommon associations.

(Doc. 23, Ex. 2, Williams Dep. at 13.)

Dr. Williams was not "convinced" that LVQ induced Plaintiff's interstitial nephritis, but he could find no other etiology.  In his view, Plaintiff's allergic interstitial nephritis was "almost undoubtedly secondary to the fluoroquinolone antibiotic," although it could also have been secondary to some of the other causes of  of the condition. (Williams Dep. at 84.)

TINU syndrome is extremely rare; only 135 cases had been reported in the worldwide literature as of 2001.  Antibiotic use was documented in only 29 percent of those cases.  Prior to Plaintiff's case, Defendant Ortho-McNeil had received only one report of a patient developing TINU after using LVQ.

Defendants have received adverse drug reaction data and forwarded corresponding MedWatch reports to the Food & Drug Administration ("FDA") involving at least fifty-seven (57) patients who developed interstitial nephritis where LVQ was listed as a suspected cause of the illness.

## II. Controlling Legal Principles

### A. Summary Judgment

Summary judgment is appropriate where the movant demonstrates that there is no genuine issue as to any material fact and that, based upon the undisputed facts, the movant is entitled to judgment as a matter of law.  *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990); *see also* Fed. R. Civ. P. 56(c).

The party requesting summary judgment always has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*quoting* Fed. R. Civ. P. 56(c)). "All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *See Hayden v. First Nat'l Bank of Mt. Pleasant*, 595 F.2d 994, 996-97 (5th Cir. 1979).   Evidence that is merely colorable, conclusory, or conjectural does not create a genuine issue of material fact. *See, e.g.*, *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988); *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989).

## B. The Inadequate Warning Claim Under AEMLD

"To maintain an action for failure to warn based upon a negligence theory or under the AEMLD, a plaintiff must prove: (1) that the defendant had a duty to warn him or her of the product's danger when used in its customary manner; (2) the defendant's warning breached that duty because it was inadequate; and (3) the breach proximately caused the plaintiff's injuries." *Rodgers v. Shave Mfg. Co., Inc.,* 993 F.Supp. 1428, 1437 (M.D.Ala. 1998) (*citing Strickland v. Royal Lubricant Company*, 911 F.Supp.1460, 1468 (M.D.Ala.1995)).

## C. The *Daubert* Standard

"If scientific, technical, or other specialized knowledge will assist the

> trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Fed. R. Evid. 702.   In *Daubert*, the Supreme Court imposed a special gatekeeping role on the trial judge to ensure that scientific evidence is both reliable and relevant before being admitted as evidence.  *See Daubert*, 509 U.S. at 589.

In order to satisfy its *Daubert* obligation, this court must "engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).  The burden is on the proponent of the witness to establish the "qualifications, reliability, and helpfulness" of the expert's opinion. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

Several non-exclusive factors should guide the trial court's reliability analysis, including: (1) whether the expert's theory has been subjected to scientific testing; (2)

whether the expert's opinions and research has been reviewed by academic peers; (3) the rate of error and controls standards; and (4) the general scientific acceptance of the technique or theory. *See Daubert*, 509 U.S. at 593-94. These factors are not a definitive check-list, and other factors may also be relevant. *See id.* at 593. "[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999).

Controlling Eleventh Circuit *Daubert* standards for toxic tort cases were enunciated in *McClain v Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005). In determining whether and exposure to a drug is causally related to a specific condition, four factors are relevant. First, the toxicological analysis must consider the relationship between the dose and the response . *See McClain*, 401 F.3d at 1241. Second, the court must consider  whether the plaintiff was exposed to a sufficient amount of the drug to cause the individual plaintiff's specific ailment. *See id.* at 1242.

Third, the court must analyze the chronological relationship between the exposure to the drug and the onset of its effects. *See McClain*, 401 F.3d at 1243. If the ailment or condition preceded the exposure to the drug, then the drug may not be deemed the culprit. *See id.* Moreover, proving a temporal relationship between the ingestion of the drug and the onset of symptoms does not establish, *ipso facto,*

-9-

causation. *Id.* In other words, proof of a temporal relationship, standing alone, is not proof of a causal relationship. *Id.*

Finally, the court must consider the background risk of a specific disease, for example, "the risk that everyone faces of suffering the same malady that a plaintiff claims without having exposure to the same toxin." *McClain*, 401 F.3d at 1243. The background risk includes all causes of a disease, excluding the drug in question.

In the *Daubert* context, an expert's declaration that his opinions are based on "broad principles of pharmacology," or that he has utilized generally accepted scientific methodology" are insufficient. The trial court does not satisfy its gatekeeping function by simply accepting the *ipso dixit* of the expert. *McClain*, 401 F.3d at 1244.

## ANALYSIS

The Defendants do not dispute that Plaintiff satisfies the first two of the three prongs of the test for a negligent failure to warn claim under the AEMLD. They do not question the general association or causation between interstitial nephritis, which developed into Plaintiff's TINU, and LVQ. The dispute relates to the reliability of Dr. Williams' opinion that LVQ specifically caused Plaintiff's interstitial nephritis, which progressed to TINU and ultimately resulted in her loss of vision.

Under *Daubert,* Dr. Williams' opinion on specific causation is unreliable for

two principal reasons.  First, the chronological relationship between Plaintiff's ingestion of LVQ and the onset of her symptoms is, at best tenuous. Dr. Williams concedes that  Plaintiff may have already been inflicted with interstitial nephritis before she took  LVQ. And if she had not, the sole basis of Dr. Williams' causation opinion is the temporal relationship between her ingestion of the drugs and the onset of her symptoms. That is insufficient.  *See McClain*, 401 F.3d at 1243.

Second, Dr. Williams' opinion fails to take into account the background risks of interstitial nephritis. "[T]he likelihood that the chemical caused the disease or illness in an individual should be considered in the context of other known causes." *McClain*, 401 F.3d at 1243 (citation omitted). Dr. Williams conceded that Plaintiff may have already been inflicted with interstitial nephritis when she first  presented to Dr. Mullins on March 12, 2003. (Williams Dep. at 73.)   Dr. Williams also conceded that there is at least a 30 percent chance that Plaintiff's condition may have been caused by unknown agents.  (Williams Dep. at 73-75.)  With knowledge that Plaintiff had ingested  Amoxicillin and Skelaxin before LVQ was prescribed for her on March 12th, and that each of these drugs is also associated with interstitial nephritis, Dr. Williams does not explain his failure to consider them, individually or

jointly, as the cause of Plaintiff's nephritis.[8]  His failure to rule out the Amoxicillin and/or Skelaxin as possible causes of  Plaintiff's interstitial nephritis is fatal to the admissibility of his testimony.

Further, Dr. Williams' opinion on specific causation lacks a foundation in medical evidence and reliable principles.   Plaintiff asserts that Dr. Williams' diagnosis is reliable being "grounded in a body of learning from medical school and his thirty years of experience practicing nephrology and internal medicine and that he used that methodology in a reliable way to reach a reasonable inference as to medical causation in this case."  (Doc. 27 at 17.)  This statement parallels those rejected by the Eleventh Circuit in *McClain*: "[The expert] attempts to anoint his opinions by claiming that he based them on the 'broad principles of pharmacology.' As noted earlier, in the *Daubert* context such phrases have little value."  *McClain*, 401 F.3d at 1244.  "The expert's assurances that he has utilized generally accepted scientific methodology [are] insufficient."  *Id.*  (citation omitted).

Plaintiff's kidney biopsy also fails to provide a reliable medical foundation for Dr. Williams' opinion on specific causation.   Dr. Horn's report revealed that Plaintiff's acute interstitial nephritis was probably due to allergic or toxic etiology.

---

[8]To his credit, Dr. Williams has advanced a plausible explanation for his discounting Protonix as a cause of Plaintiff's malady. He observed that Plaintiff interstitial nephritis improved even as she continued  to take this drug.

Dr. Williams' leap from the interstitial nephritis diagnosis to interstitial nephritis caused by LVQ is not supported by Dr. Horn's report.

Without Dr. Williams' opinion, Plaintiff cannot raise a genuine issue of specific causation between LVQ and her illness.  The court concludes that his testimony is inadmissible under *Daubert* and *McClain*.

Since there is no genuine issue of material fact on the issue of specific causation, the Defendants are entitled to judgment as a matter of law.

An order granting summary judgment has previously been entered.

Done the 12th day of January, 2007.

U.W. Clemon
United States District Judge